IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| CONSUELO CERVANTES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-18-CV-00110-KC |
| | § | |
| TENET HOSPITALS LIMITED, a | § | |
| Texas Limited Partnership, d/b/a THE | § | |
| HOSPITALS OF PROVIDENCE | § | |
| EAST CAMPUS, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day, the Court considered Defendant Tenet Hospitals' Motion to Dismiss Plaintiff's Second Amended Complaint. ECF No. 22. For the reasons below, the Motion is **DENIED**.

**I. BACKGROUND**

The following facts are alleged in Plaintiff Consuelo Cervantes' Second Amended Complaint ("SAC"), ECF No. 25, and, at this stage, are accepted by the Court as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff alleges she arrived at Defendant Providence Hospital at 6:59 a.m. on April 10, 2016, after Del Sol Hospital detected loops of bowel in a hernia but then told her "to go to another hospital." SAC 2–3. Plaintiff alleges her blood pressure was low at 97/49 and her pulse rapid at 125 beats per minute, which are symptoms associated with shock. *Id.* at 3. A nurse categorized Plaintiff as a "2" on the Emergency Severity Index, meaning she had a "high risk of deterioration, or a time-critical problem." *Id.* Given this categorization, Plaintiff asserts, Defendant's policy is to examine the patient on a frequent basis, and order several tests, including blood count, metabolic panel, blood

1

sugar, and a CT scan, "instantly or immediately." *Id.* at 5. Plaintiff claims a physician began an examination at 7:23 a.m. and never examined her again. *Id.* Further, even though Defendant possessed the capability to complete the tests within an hour, it did not. *Id.*

At 12:36 p.m., about five and a half hours after Plaintiff arrived at the hospital, the physician ordered a CT scan. *Id.* The physician reviewed the results of the scan three hours later, at 3:41 p.m., which revealed "air in the abdominal cavity and outside the intestines, fluid in the abdominal cavity outside the intestines, and a ventral hernia above the umbilical area containing loops of bowel." *Id.* at 5–6. Plaintiff then underwent surgery at 7:00 p.m. *Id.* at 6. She was admitted to intensive care for septic shock caused by necrotic and perforated bowel, and remained hospitalized from April 10, 2016, until May 19, 2016, when she was transferred to a rehabilitation center. *Id* at 6–7.

Plaintiff filed suit in April 2018, and Defendant successfully moved to dismiss the first amended complaint. Order Granting Motion to Dismiss, October 29, 2018, ECF No. 20. This Court granted Defendant's motion to dismiss and allowed Plaintiff to file an amended complaint. *Id.* at 11. Plaintiff did so and claims Defendant's conduct violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (2017), by failing to "appropriately screen Plaintiff to timely determine whether Plaintiff had an emergency medical condition" because the hospital did not follow its own screening procedures. SAC 7. Defendant subsequently filed the instant Rule 12(b)(6) motion to dismiss for failure to state a claim, arguing that Plaintiff's EMTALA claim cannot succeed because, despite any alleged deviations from its screening procedure, she was admitted to the hospital and her emergency condition was identified. Mot. 7.

## II. DISCUSSION

### A. Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint for failing to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Colony Ins. Co.*, 647 F.3d at 252. Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted). Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

B.     **Analysis**

Defendant argues that because it eventually identified Plaintiff's emergency medical condition and admitted her, it satisfied its EMTALA obligations.[1]  Mot. 7.  However, because Defendant's assertion, if accepted, would permit disparate medical screening examinations, the Court disagrees. [2]

1.     **Overview of EMTALA**

To prevent hospitals from rejecting, or "dumping," indigent patients, Congress passed EMTALA and created specific duties for participating hospitals with emergency rooms.  42 U.S.C. § 1395dd; *Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000).  A hospital must provide any individual that comes to the emergency room an appropriate screening to identify an emergency medical condition and then stabilize the individual before transfer or discharge.  42 U.S.C. § 1395dd(a)–(c).  The Act, however, does not create a federal medical malpractice cause of action, and so neither does it set out a nationwide standard of care.  *Marshall ex rel Marshall v. E. Carrol Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998).  Instead, it largely leaves the contours of care to the hospital's own policies.  *Fewins v. Granbury Hosp. Corp.*, 662 F. App'x 327, 331 (5th Cir. 2016); *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 997 (9th Cir. 2001).  "Because hospitals are generally in the best position to assess their

---

[1] Defendant attached a medical treatment record to its motion to dismiss that it asserts would show Defendant provided Plaintiff with an appropriate medical screening.  Mot. Ex. A.  As the Court explained in its prior Order, the Court may consider documents attached to a motion to dismiss only if the documents are "referred to in the plaintiff's complaint and are central to her claim."  *See* Order Granting Motion to Dismiss 7; *Collins,* 224 F.3d at 498–99.  The Court again does not consider the medical treatment record.  Although the Complaint references the medical record, SAC 5, it is not central to Plaintiff's claims.  *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 535–39 (5th Cir. 2003).  Unlike, for example, a contract in a contract dispute, considering the medical record would not "dispose of the claim entirely" because Plaintiff can cite other contradictory or contextualizing evidence.  *See Crucci v. Seterus, Inc.*, No. EP-13-CV-317-KC, 2013 WL 6146040, at *6 (W.D. Tex. Nov. 21, 2013).  Accordingly, the Court does not consider the medical treatment record.  *See Collins,* 224 F.3d at 498–99.

[2] Defendant also argues that as long as a medical screening examination begins promptly, any delays afterward do not give rise to liability.  Mot. 12.  Because the Court finds Plaintiff's complaint survives based on disparate treatment, it does not consider Defendant's delay argument.

own capabilities, a standard screening policy for patients entering the emergency room generally defines which procedures are within a hospital's capabilities." *Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 481 (S.D. Tex. 2009), *aff'd*, 409 F. App'x 769 (5th Cir. 2011).

### 2. Screening claim

The present controversy centers exclusively on EMTALA's screening requirement. The Act requires hospitals with emergency rooms to provide an "appropriate medical screening within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). EMTALA does not define an "appropriate medical screening examination," though it does specify the examination's purpose is to determine "whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). What is "appropriate" in a given case depends upon the apparent severity of the symptoms and the capabilities of the hospital; that is, any screening examination must be "reasonably calculated to determine whether or not an emergency condition exists." *Correa v. Hosp. San Francisco*, 69 F. 3d 1184, 1192 (1st Cir. 1995); *Guzman*, 637 F. Supp. 2d at 482. "The essence of this requirement" is that hospitals have a screening procedure in place and apply the procedure "uniformly to all those who present substantially similar complaints." *Correa*, 69 F.3d at 1192 (citing *Baber*, 977 F.2d at 879); *see Marshall*, 134 F.3d at 323–24; *Repp v. Andarko Mem'l Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994); Centers for Medicare and Medicaid Services ("CMS"), State Operations Manual, Interpretive Guidelines, Appendix V—Interpretive Guidelines—Responsibilities of Medicare Participating Hospitals in Emergency Cases 36, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107ap_v_emerg.pdf ("If a hospital applies in a nondiscriminatory manner (i.e. a different level of care must not exist based on payment status, race, national origin, etc.) a screening process reasonably calculated to determine whether an

5

[emergency] exists, it has met its obligations under EMTALA."). A plaintiff can establish disparate treatment with evidence the hospital did not adhere to its own screening procedures. *See Battle*, 228 F.3d 544, 558 (5th Cir. 2000); *see also Romo v. Union Mem'l Hosp. Inc.*, 878 F. Supp. 837, 842 (W.D.N.C. 1995) ("Indisputably, a standard operating procedure represents the method by which all similarly situated persons . . . should be treated.").

Contrary to Defendant's argument, a correct diagnosis and admission to a hospital does not end an EMTALA screening inquiry. First, particular medical outcomes are not the measure of an appropriate medical screening. *Guzman*, 637 F. Supp. 2d at 482 (citing *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991)); CMS, State Operations Manual, Interpretive Guidelines, Appendix V—Interpretive Guidelines—Responsibilities of Medicare Participating Hospitals in Emergency Cases 36 ("Regardless of positive or negative individual outcome, a hospital would be in violation of the anti-dumping statute if it fails to meet any of the medical screening requirements under 42 C.F.R. 489.24."). Consequently, just as an eventual correct diagnosis does not preclude an EMTALA screening claim premised on an "egregious and unjustified" delay, *see, e.g.*, *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 647, 652–53 (E.D. Pa. 2010), it does not cure a hospital's failure to adhere to its own procedures. *See Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 259 (D.P.R. 2000) (finding a hospital's failure to follow its procedures could give rise to an EMTALA claim even though the hospital correctly diagnosed the patient's heart attack and treated him for eight days); *Blake v. Richardson*, No. 98-2576-JWL, 1999 WL 319082, at *2–3 (D. Kan. Apr. 1, 1999) (denying motion to dismiss patient's EMTALA claim when hospital treated patient differently based on sexual orientation, even though hospital diagnosed and treated patient's appendicitis).

Similarly, "the provision of some . . . treatment [does not] *a priori* satisf[y] a hospital's statutory obligation to appropriately screen." *Marrero v. Hosp. Hermanos Melendez, Inc.*, 253 F. Supp. 2d 179, 195 (D.P.R. 2003); *Torres Otero*, 115 F. Supp. 2d at 259; *see also Romo*, 878 F. Supp. at 840, 842–43 (denying summary judgment for hospital when it performed "numerous tests and procedures" and decided patient needed monitoring, but failed to follow hospital procedures). In other words, admission to and treatment in a hospital also do not preclude an EMTALA screening claim. *See Torres Otero*, 115 F. Supp. 2d at 259. The screening requirement provides the crucial first step of the Act's gap-filling function to supplement state tort law and uniformly bring patients under a hospital's care. *See Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 714 (4th Cir. 1993). And whether a hospital "follow[s] its own screening procedures can support a finding of EMTALA liability for disparate treatment." *Battle*, 228 F.3d at 558. This analysis gives deference to a hospital's own guidelines—since a hospital is required only to provide a screening that is within its capabilities—while ensuring hospitals do not employ invidious distinctions when applying their screening procedures. *See Guzman*, 637 F. Supp. 2d at 481–82.

Moreover, holding a hospital to its own screening procedures, even when a patient is later admitted, does not transform EMTALA into a federal malpractice statute. As the Fourth Circuit illustrated in *Power v. Arlington Hospital Association*, 42 F.3d 851, 859 (4th Cir. 1994), although a defendant may, at times, simultaneously commit malpractice and violate EMTALA, the causes of action remain distinct:

> Consider a situation in which a hospital adheres to a standard requiring tests A, B, and C as part of an appropriate emergency room medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard of care applicable in a malpractice claim. But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of

7

> EMTALA may not be established, but medical negligence may be. In short, the issue is not whether the Hospital's treatment was adequate as measured against a malpractice standard of care, . . . but rather whether the claimant received the same screening examination regularly provided to other patients in similar circumstances.

*Id.*

The district court in *Romar ex rel. Romar v. Fresno Community Hospital & Medical Center*, 583 F. Supp. 2d 1179, 1187 (E.D. Cal. 2008) also explained:

> "[A] hospital with 'low standards' may comply with its EMTALA screening obligation . . . but at the same time violate state medical negligence . . . . It is also theoretically possible for a hospital with 'high standards' to violate EMTALA . . . but at the same time comply with state medical malpractice law."

*Id*.

Screening claims based on a misdiagnosis, ill-advised discharge, or egregious delay may overlap with medical malpractice, yet they remain separate causes of action—admission and treatment do not negate that distinction. *See McClure v. Parvis*, 294 F. Supp. 3d 318, 322–23 (E.D. Pa. 2018) (holding that patient's EMTALA screening-delay and negligence claims both survived though defendant hospital correctly diagnosed patient).

The cases which Defendant relies on to support the contention that correct diagnosis, admission, and treatment absolve hospitals of liability under EMTALA are unconvincing. First, Defendant relies *Benitez-Rodriguez v. Hospital Pavia Hato Rey, Inc.*, 588 F. Supp. 2d 210 (D.P.R. 2008) for the proposition that admission and treatment defeat a screening claim. Mot. 15. In *Benitez-Rodriguez*, the court dismissed the plaintiff's screening claim, reasoning it would "border on the absurd to conclude that a hospital that has provided extensive emergency and inpatient care to an individual, failed to screen him or her as it would any other patient in his or her condition." *Benitez-Rodriguez*, 588 F. Supp. 2d at 216. The court adopted the logic of the Eleventh Circuit's decision in *Harry v. Marchant*, "stating that admission precludes a stabilization claim" and applied it to the plaintiff's screening claim. *Id.* at 215–16 (citing *Harry*

8

*v. Marchant* ("*Harry II*"), 291 F.3d 767, 769 (11th Cir. 2002)). But the Eleventh Circuit's task in *Harry II* was "solely to determine the scope of EMTALA's stabilization requirement." 291 F.3d at 769. And it is clear that "[t]he duty to appropriately screen is independent from the duty to stabilize." *Marrero*, 253 F. Supp. 2d at 198. As the court in *Harry II* recognized, appropriate medical screenings are meant to "guarantee patient entry into the medical system." 291 F.3d at 773. Moreover, "[t]he essence of this requirement" is that the screening policy "be administered even-handedly." *Guzman*, 637 F. Supp. 2d 464 (citing *Correa*, 69 F.2d at 1192). Certainly, admission and treatment could tend to show the hospital treated the patient just as it would any other. Indeed, in *Benitez*, the plaintiff did not allege she was treated differently from other patients, only that the hospital erred in its initial diagnosis because of an inadequate screening. 588 F. Supp. 2d at 216. But to the extent the *Benitez* court found eventual admission and treatment to be un-rebuttable proof of uniform treatment, the Court declines to follow that approach. Rather, the Court applies the Fifth Circuit's rule that disparate treatment supports an EMTALA screening claim. *See Fewins*, 662 F. App'x at 331; *Battle*, 228 F.3d at 557; *Marshall*, 134 F.3d at 322.

Two other cases Defendant relies on, *Harry* and *Collins*, are distinguishable. Mot. 15. In *Harry v. Marchant* ("*Harry I*"), the Eleventh Circuit dismissed a screening claim. 237 F.3d 1315, 1319 (11th Cir. 2001), *vacated, reh'g en banc*, 259 F.3d 1310 (11th Cir. 2001), *reinstated in part on reh'g*, 291 F.3d 767 (11th Cir. 2002).[3] Shortly after the plaintiff's arrival to the hospital, she was correctly diagnosed with possible pulmonary embolism, but the hospital allegedly failed to perform a "VQ scan" because it required an isotope that was not in stock. *Id.* at 1316. Nonetheless, because the hospital admitted the patient after it "conducted an initial

---

[3] Defendant, in relying on *Harry I*, did not indicate that the opinion has been vacated or explained the effect of the vacatur on the applicability of the decision. Mot. 15. Nevertheless, to the extent the opinion remains persuasive authority, the Court finds the present case distinguishable.

screening examination and determined [the plaintiff] had an emergency condition, notwithstanding the lack of a VQ scan," the court concluded the allegations could not sustain a screening claim. *Id.* at 1319.

Similarly, in *Collins*, the Tenth Circuit granted the defendant hospital summary judgment because it provided an appropriate medical screening. *Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir. 1992). The patient was unconscious when he arrived at the hospital. *Id.* at 306. The hospital treated only his brain injury, failing to x-ray his hip to check for fractures. *Id.* Despite allegations that the delay in identifying his hip fracture caused harm, the court found the plaintiff's situation was "*not* a case where the hospital failed to detect [his] emergency medical condition because of inappropriate screening procedures." *Id.* at 308. Importantly though, the court did not read EMTALA to require identification of "*all* of the emergency medical conditions." *Id.* at 307 n.5. In addition, although it is unclear, it appears the court assumed the hospital was negligent, not that it violated its own standards: with no discussion of allegations of disparate treatment, the court assumed that "ordinarily a person with [the plaintiff's] injuries would have had a hip X-ray upon his arrival." *Id.* at 306 n.3.

In this case, rather than a quick diagnosis as in *Harry I*, Plaintiff alleges the identification of sepsis and necrotic bowel occurred more than eight hours after she was initially seen by a physician because Defendant failed to follow its screening policy. SAC 5–6; *see Harry I,* 237 F.3d at 1316. Further, it is unclear whether the court in *Collins* compared the hospital's actions to a reasonable standard of care or to its own policies, *see* 963 F.2d at 306 n.3, but here, Plaintiff specifically alleges Defendant failed to adhere to its own policies, SAC 5, 7. What is more, unlike in *Collins*, the allegations are not that Defendant failed to identify all of Plaintiff's medical emergencies, but that it did not identify any until Plaintiff's condition had already

10

deteriorated to the point of causing "numerous complications, including respiratory and renal failure." *Id.* at 6; *see Collins*, 963 F.2d at 307 n.5. Because Plaintiff asserts straightforward allegations of disparate treatment premised on Defendant's failure to adhere to its screening guidelines, Plaintiff states a valid EMTALA screening claim, and Defendant's Motion is denied. *See Battle*, 228 F.3d at 557.

III.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 22, is **DENIED**.

**SO ORDERED.**

**SIGNED this 26th day of March, 2019.**

_____
**KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE**